1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14

MORRIS MEHRABAN; ELHAM
MEHRABAN; ALAN MEHRABAN;
ARIELLE MEHRBAN; DANIELLE
MEHRABAN; AND MORRIS
MEHRABAN AND ELHAM
MEHRABAN DEMAND RIGHT
TRUST,

                    Plaintiffs,

          vs.

FEDERAL DEPOSIT INSURANCE
CORPORATION, in its own name and as
Receiver for IndyMac Bank, F.S.B.,
Pasadena, CA; DOES 1 through 10,

                    Defendants.

CASE NO. CV 08-05964 MMM (AJWx)


FINDINGS OF FACT AND
CONCLUSIONS OF LAW

15
16
17
18
19
20
21
22
23
24
25
26
27
28

        On July 11, 2008, the Office of Thrift Supervision ("OTS") closed IndyMac Bank, F.S.B. ("IndyMac") and appointed the Federal Deposit Insurance Corporation ("FDIC") as the bank's receiver pursuant to 12 U.S.C. § 1821(c)(2)(A).  That same day, the FDIC formed IndyMac Federal Bank, a newly chartered depository institution, and transferred IndyMac's insured deposits to it.  The FDIC made deposit insurance determinations for accounts held at IndyMac

and notified depositors of the determinations via letter.  Some depositors, including plaintiffs, later filed actions challenging the FDIC's deposit insurance determinations and/or alleging wrongful acts by IndyMac or its former employees prior to commencement of the receivership.

The FDIC filed an opening brief on November 30, 2009.[1]  On December 21, 2009, plaintiffs filed a reply brief.[2]  Following the passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") on July 21, 2010, the parties submitted supplemental briefing regarding the FDIC's revised deposit insurance determination for plaintiffs' accounts.[3]

## I.  FINDINGS OF FACT

### A.     The Accounts

1.     Plaintiff Morris Mehraban had three accounts with IndyMac prior to July 11, 2008.[4]

2.     Prior to July 11, 2008, account XXXXXX5987 had a balance of $471,345.39 and account XXXXXX3163 had a balance of $100,599.07.  Both accounts were held by Morris

---

[1] Defendant Federal Deposit Insurance Corporation's Opening Trial Brief ("FDIC's Brief"), Docket No. 28, (Nov. 30, 2009).

[2] Plaintiffs' Reply Brief ("Pls.' Brief"), Docket No. 30 (Dec. 21, 2009); Defendant Federal Deposit Insurance Corporation's Response Trial Brief ("FDIC's Reply"), Docket No. 29 (Dec. 21, 2009).  Because plaintiffs had not filed an opening brief by the deadline set by the court, the FDIC filed a responding brief on December 21, 2009, noting the failure and arguing that the court should plaintiffs' failure to file a brief consent to the FDIC's insurance determination.  This brief appears to have been filed just prior to plaintiffs' reply brief.

[3] Plaintiffs' Brief Reviewing New Insurance Determination ("Plaintiff's Supp. Brief"), Docket No. 43 (Nov. 9, 2010); Plaintiffs' Reply Brief Reviewing New Insurance Determination ("Plaintiff's Supp. Reply"), Docket No. 45 (Nov. 23, 2010); FDIC's Brief Addressing Judicial Review of the FDIC's New Deposit Insurance Determination ("FDIC's Supp. Brief"), Docket No. 44 (Nov. 9, 2010); FDIC's Reply Brief Addressing Judicial Review of the FDIC's New Deposit Insurance Determination ("FDIC's Supp. Reply"), Docket No. 46 (Nov. 23, 2010).  The FDIC also submitted a supplemental administrative record.  (See Declaration of Belinda Davis Attaching Supplemental Administrative Record ("Davis Decl."), Docket No. 42 (Oct. 26, 2010).

[4] Declaration of Dustin Koch Attaching Administrative Record ("Koch Decl."), Docket No. 20 (June 8, 2009), ¶ 2.

Mehraban ITF Elham Mehraban.[5]  The funds deposited in these two accounts totaled $571,944.46.[6]

3.   Prior to July 11, 2008, account XXXXXX6665 had a balance of $378,670.43.  It was held by Morris Mehraban ITF Danielle Mehraban, Arielle Mehraban, and Alan Mehraban.[7]

4.   All three accounts were revocable trust accounts.[8]

**B.   The FDIC's Recovery of IndyMac Data**

5.   Before IndyMac Bank closed, the FDIC requested deposit account records maintained by the computer deposit system at IndyMac Bank.  The FDIC requested approximately 45 data fields for each deposit account along with electronic copies of trial balances, deposit application reconciliations, and the general ledger of the bank.  The FDIC requested this data in advance of IndyMac Bank's closure to test delivery capabilities, prove the balancing and reconciliation processes, and make certain that all required data fields had been included.[9]

6.   As a result, from March 20 to July 18, 2008, FDIC employees transferred files from the computers of IndyMac Bank to those of the FDIC.  Prior to IndyMac Bank's closure, the FDIC's technical staff worked with IndyMac Bank to verify the accuracy of the data so that the files provided to the FDIC could be processed properly.  The FDIC verified the sum of the current balance and accrued interest data fields.  It also checked data against the

---

[5]Koch Decl., ¶ 4, Exh. B.  All but the last four digits of the account numbers are redacted to protect the personal information of the account holder.  (Koch Decl., ¶ 3 n. 1.)  See also Declaration of Victor Villarreal ("Villareal Decl."), Docket No. 33 (June 14, 2010), Exh. A.  Victor Villareal is a Lead Information Technology Specialist at the FDIC who personally assisted with the transferring of electronic deposit account records maintained by IndyMac Bank to the FDIC's program for processing deposit insurance, known as the Receivership Liability System ("RLS").  (Id., ¶ 1.)

[6]Koch Decl., ¶ 4, Exh. B; Villarreal Decl., Exh. A.

[7]Koch Decl., ¶ 5, Exh. A; Villarreal Decl., Exh. A.

[8]Koch Decl., ¶ 3.

[9]Villarreal Decl., ¶ 3.

1    bank's general ledger to ensure that the FDIC received all deposit products.[10]

2    7.    Subsequently, the FDIC transferred the computerized deposit account records of IndyMac

3    Bank to its Receivership Liability System ("RLS").  This process involved three types of

4    files maintained at IndyMac Bank:

5    a.    The "Deposit.csv" file, known as the "Deposit File," a database of deposit

6    accounts;

7    b.    The "CIF.csv" file, known as the "Customer Information File," a database of all

8    customers; and

9    c.    The "DIF_CIF.csv" file, known as the "CIF Joint File," which maps customers

10    and their relationships to deposit accounts.[11]

11    8.    Combining information from the Deposit File and the Customer Information File, the

12    FDIC created an account title in the RLS for each IndyMac Bank deposit account.  The

13    Deposit and Customer Information files provided the account number, the owner or owners

14    of each account, the "relationship code" for the names on the account, the then-current

15    deposit balance, the accrued interest, and the date the account was opened, among other

16    information.[12]

17    9.    The "relationship code" is a code included in IndyMac Bank's Customer Information File

18    that described the relationship between the account owner or owners and other names on

19    the account, including beneficiaries.  Names and relationship codes in the Customer

20    Information File were used to create the account title for each account loaded into the RLS.

21    These codes included:

22    a.    "BNI," which stands for "beneficiary – individual trust," i.e., a beneficiary of a

23    revocable trust account held by a single owner;

24    b.    "BNJ," which stands for "beneficiary – joint trust," i.e., a beneficiary of a

25    _____

26    [10]*Id.*, ¶ 5.

27    [11]*Id.*, ¶ 6.

28    [12]*Id.*

4

revocable trust account held by multiple owners;

c.    "JBO," which stands for "joint owner with a beneficiary," i.e., a joint revocable trust account;

d.    "JTO," which stands for 'joint owner," i.e., a joint ownership account;

e.    "SLB," which stands for "sole owner with beneficiary," i.e., a beneficiary of a revocable trust account;

f.    "SOL," which stands for "individual owner," i.e., a single ownership account;

g.    "TRS," which stands for "trustee," i.e., funds held by a bank pursuant to an irrevocable trust account; and

h.    "TST," which stands for "trust," i.e., a formal revocable trust account.[13]

10.    The Customer Information File also uses the following acronyms:

a.    "AFT" means "as trustee for";

b.    "ITF" means "in trust for"; and

c.    "POD" means "payable-on-death to."[14]

11.    On July 11, 2008, after the FDIC closed out the day's business so that it could determine end-of-day account balances, it processed IndyMac Bank's deposit data for use in the RLS.[15]  Using all the data previously described, as uploaded from IndyMac Bank's deposit records, the RLS grouped depositors based on name, address, and tax identification number to produce a "Final Grouping Report."  The report lists the accounts owned by an individual depositor, the account balances in those accounts, and the account numbers.  If there are uninsured or potentially uninsured funds, the RLS also produces an "XX/PH Worksheet" for use by FDIC Claims Agents.[16]  The Final Grouping Report and the XX/PH

---

[13]*Id.*, ¶ 9.

[14]*Id.*, ¶ 10.

[15]*Id.*, ¶ 7.

[16]The abbreviation "XX" refers to "excess" or uninsured balances. The abbreviation "PH" refers to "pass with hold" for potentially uninsured balances that require further review. (*Id.*, ¶

Worksheet are reviewed by FDIC Claim Agents to approve a deposit insurance determination. Once that determination is finalized, the RLS produces a Notice of Allowance of Claim and a Receivership Certificate for the uninsured balances.[17]

12.  In response to the court's order requiring the FDIC to augment the administrative record to provide source information, the FDIC submitted the information obtained from IndyMac Bank for plaintiffs' accounts that was used to populate the RLS. These records show the account numbers, the owners, the relationship code for the names on the accounts, the then-current deposit balance, the accrued interest, and the date the account was opened.[18]

13.  The source information confirms that Morris Mehraban is listed on accounts XXXXXX5987 and XXXXXX3163 under the relationship code "SLB," indicating that he was a sole owner with a beneficiary; Elham Mehrban is listed under the relationship code "BNI," indicating that she is the beneficiary of these revocable trust accounts. The source information also confirms that Morris Mehraban is listed on account XXXXXX6665 under the relationship code "SLB," i.e., sole owner with beneficiaries, and that Danielle Mehraban, Arielle Mehraban, and Alan Mehraban are listed under the relationship code "BNI," indicating that they are the beneficiaries of this revocable trust account.[19]

14.  The source information verifies that account XXXXXX5987 had a balance of $471,303.43 in principal and $41.96 in accrued interest as of the close of business on July 11, 2008; this confirms the RLS-reported balance of $471,345.39. The source information also verifies that account XXXXXX3163 had a balance of $100,521.19 in principal and $77.88 in accrued interest, confirming the RLS-reported balance of $100,599.07. The source information further verifies that account XXXXXX6665 had a balance of $378,388.67 in principal and $281.76 in accrued interest, confirming the RLS-reported balance of

12.)

[17]*Id.*

[18]Villareal Decl., ¶ 14, Exh. A.

[19]Villareal Decl., Exh. A.

1    $378,670.43.[20]

2    **C.    The FDIC's Insurance Determination**

3    15.    The FDIC as receiver for IndyMac assigned Dustin Koch to review deposit insurance

4    coverage and claims arising out of IndyMac's failure.  Koch reviewed the three accounts

5    at issue in this case.[21]

6    16.    On approximately July 15, 2008, Koch concluded that under the deposit insurance rules

7    codified at 12 C.F.R. § 330.10, accounts XXXXXX5987 and XXXXXX3163 were

8    informal revocable trust accounts with one owner, Morris Mehraban, and one beneficiary,

9    Elham Mehraban.  Koch determined that Elham Mehraban was a qualifying beneficiary

10   (spouse).  Because the two accounts had one owner and one qualifying beneficiary, the

11   qualifying relationship was insured up to $100,000.00.[22]

12   17.    He thus concluded that the total insured amount for these two accounts was $100,000.00

13   and that the total uninsured amount was $471,944.46.[23]

14   18.    On approximately September 10, 2008, Koch concluded that under the deposit insurance

15   rules codified at 12 C.F.R. § 330.10, the account XXXXXX6665 was an informal

16   revocable trust account with one owner, Morris Mehraban, and three beneficiaries,

17   Danielle, Arielle, and Alan Mehraban.  Koch determined that Danielle, Arielle, and Alan

18   Mehraban were qualifying beneficiaries (children).  Because the account had one owner

19   and three qualifying beneficiaries, each qualifying relationship was insured up to

20   $100,000.00.[24]

21   19.    Koch thus concluded that the total insured amount for this account was $300,000.00 and

22

23   [20]Villareal Decl., Exh. A.  The accrued interest amounts have been rounded to the nearest

24   cent.

25   [21]Koch Decl., ¶ 2.

26   [22]*Id.*, ¶ 4, 6.

27   [23]*Id.*, ¶ 4.  $571,944.46 - $100,000.00 = $471,944.46.

28   [24]*Id.*, ¶¶ 5-6.

that the total uninsured amount was $78,670.43.[25]

20.   On July 15, 2008, the FDIC sent Morris Mehraban a Receivership Certificate for accounts XXXXXX5987 and XXXXXX3163 in the amount of $471,944.46.[26]   On September 11, 2008, it sent Morris Mehraban a Receivership Certificate for account XXXXXX6665 in the amount of $78,670.43.[27]

21.   Based on its calculation that disposition of IndyMac's assets would result in a recovery of approximately 50% of the bank's uninsured deposits, the FDIC sent the Mehrabans a 50% advance dividend of $275,307.45.[28]

22.   On July 21, 2010, the Dodd-Frank Act, Pub. L. No.1 I 1-203, took effect. Section 335 of the Dodd-Frank Act amended the Federal Deposit Insurance Act, 12 U.S.C. § 1821(a)(1)(E), by increasing the standard maximum deposit insurance amount ("SMDIA") from $100,000 to $250,000.   The act made the increase permanent and retroactive to January 1, 2008.  Section 335 directed that, in applying the $250,000 deposit insurance amount retroactively to January 1, 2008, the FDIC subtract: (1) deposit insurance previously paid to depositors by the FDIC, and (2) payments (such as dividends) previously made to depositors by the FDIC as Receiver.[29]

23.   Immediately following the effective date of the Dodd-Frank Act, the FDIC calculated the increased deposit insurance amounts due IndyMac Bank depositors with uninsured deposit balances.[30]   The starting point for the FDIC's analysis was its final deposit insurance

---

[25]*Id.*, ¶ 5.  $378,670.43 - $100,000.00 = $78,670.43.

[26]*Id.*, ¶ 7; Exh. D.

[27]*Id.*; Exh. C.

[28]*Id.*, ¶ 8.

[29]Davis Decl., ¶ 5.

[30]*Id.*, ¶ 6.

determination following the bank's closure in 2008,[31] specifically each depositor's account balance as of July 11, 2008, the amount of insurance provided to each depositor, the amount of any Receivership Certificates sent to depositors, and the amount of the 50% advance dividend paid to depositors.[32]

24.  As a result of the Dodd-Frank Act, Mehraban received an additional deposit insurance payment of $39,335.21 on Account No. XXXXXX6665, the account underlying Receivership Certificate No. 10034, because the insurance and dividend payments he previously received were less than the maximum retroactive increase in the deposit insurance limit.[33]  Following this payment, the original balance in Account No. XXXXXX6665 was fully insured.

25.  Mehraban did not receive an additional deposit insurance payment on the accounts underlying Receivership Certificate No. 3335, however, because the deposit insurance and dividend payments he had already received were greater than the retroactive increase in insurance.  The FDIC Receiver sent Mehraban a revised Receivership Certificate dated July 30, 2010 in the amount of $321,944.46 for the uninsured deposit balances in Accounts Nos. XXXXXX5987 and XXXXXX3163.[34]

## II.  CONCLUSIONS OF LAW

### A.    Standard of Review

26.  The FDIC's determination of insurance coverage is governed by the Federal Deposit Insurance Act ("FDIA"), as amended, 12 U.S.C. §§ 1811 et seq.

27.  The FDIC's final determination "regarding any claim for insurance coverage [is] a final

---

[31]*Id.*

[32]*Id.* Ex. C (FDIC's record of payments made to plaintiffs, including Receivership Certificates and dividends).

[33]*Id.*, ¶ 9.

[34]*Id.*, Exh. D (revised Receivership Certificate).

1    agency action reviewable in accordance with" the Administrative Procedure Act ("APA").

2    12 U.S.C. § 1821(f)(4).   Under the APA, the court examines whether the FDIC's decision

3    was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with

4    law." 5 U.S.C. § 706(2)(A).   The parties thus agree that the relevant question the court

5    must answer is whether the FDIC's action was arbitrary or capricious.[35]

6    28.   Final agency action is arbitrary and capricious if the agency "'has relied on factors which

7    Congress has not intended it to consider, entirely failed to consider an important aspect of

8    the problem, offered an explanation for its decision that runs counter to the evidence before

9    the agency, or is so implausible that it could not be ascribed to a difference in view or the

10    product of agency expertise.'"   *O'Keeffe's Inc. v. U.S. Consumer Product Safety

11    Commission*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Manufacturers'

12    Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983)).

13    29.   A district court is limited to a review of the reasoning on which the agency relied in

14    making its decision.   *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1091 (9th Cir. 2007)

15    (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).   It can "uphold a decision of less

16    than ideal clarity if the agency's path may reasonably be discerned."   *Motor Vehicles

17    Manufacturers' Association*, 463 U.S. at 43.   Where an agency offers an "interpretation

18    of its own regulation [that] reflects its considered views," even if those views are

19    developed in response to litigation and communicated in a legal brief, the court should

20    accept the interpretation if convinced it is not "merely a *post hoc* rationalization."   *Long

21    Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007).   See also *Alaska v. Federal

22    Subsistence Board*, 544 F.3d 1089, 1094 (9th Cir. 2008) ("While we may not fabricate a

23    rational basis for an agency's action, we will 'uphold a decision of less than ideal clarity

24    if the agency's path may reasonably be discerned,'" quoting *Motor Vehicles

25    Manufacturers' Association*, 463 U.S. at 43).   "'Nevertheless, the agency must examine

26    the relevant data and articulate a satisfactory explanation for its action including a rational

27    _____

28    [35]Pls.' Brief at 4; FDIC's Brief at 3.

connection between the facts found and the choice made.'"   *Northwest Coalition for Alternatives to Pesticides (NCAP) v. United States Environmental Protection Agency*, 544 F.3d 1043, 1048 (9th Cir. 2008) (quoting *Motor Vehicles Manufacturers' Association*, 463 U.S. at 43).

30.   "[A]n agency's interpretation of its own regulations is 'controlling' unless 'plainly erroneous' or inconsistent with 'the regulations being interpreted.'"   *Public Citizen v. Nuclear Regulatory Commission*, 573 F.3d 916, 923 (9th Cir. 2009) (quoting *Long Island Care at Home*, 551 U.S. at 171).  See also *Long Island Care at Home*, 551 U.S. at 170-71 ("[A]s long as interpretive changes create no unfair surprise . . . change in interpretation alone presents no separate ground for disregarding the Department's present interpretation"); *River Runners for Wilderness v. Martin*, 574 F.3d 723, 736 (9th Cir. 2009) ("[F]ederal agencies are entitled to some leeway when interpreting their own policies and regulations," citing *Stinson v. United States*, 508 U.S. 36, 45 (1993)).  "In other words, we must defer to the [agency's] interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation.'"   *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).   See also *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.*, 339 F.3d 1126, 1131 (9th Cir. 2003) ("When the meaning of regulatory language is ambiguous, the agency's interpretation of the regulation controls 'so long as it is 'reasonable,' that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations,'" quoting *Martin v. Occupational Safety & Health Review Commission*, 499 U.S. 144, 150-51 (1991)); *Wards Cove Packing Corp. v. National Marine Fisheries Service*, 307 F.3d 1214, 1218 (9th Cir. 2002) ("An agency's interpretation of regulations it is charged with administering is entitled to a high degree of deference and will be upheld as long as it is not plainly erroneous or inconsistent with the regulation").

**B.      Supplementation of the Record**

31.   Although judicial review of an agency's decision under 5 U.S.C. § 706 is typically confined to the administrative record, courts have crafted narrow exceptions to this rule. See, e.g., *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) ("In limited circumstances, district courts are permitted to admit extra-record evidence: (1) if admission is necessary to determine 'whether the agency has considered all relevant factors and has explained its decision,' (2) if 'the agency has relied on documents not in the record,' (3) 'when supplementing the record is necessary to explain technical terms or complex subject matter,' or (4) 'when plaintiffs make a showing of agency bad faith.' These limited exceptions operate to identify and plug holes in the administrative record.  Though widely accepted, these exceptions are narrowly construed and applied" (citations omitted)).

32.   The Ninth Circuit has held that "[t]he 'whole' administrative record [ ] consists of all documents and materials directly *or indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position."   *Thompson v. United States Department of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (internal quotation marks and citation omitted).

33.   When a reviewing court finds it necessary to look outside the administrative record to evaluate whether an agency has considered all relevant factors and adequately explained its decision, it should obtain additional explanations of agency action from the agency itself.   *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) ("If . . . there was such failure to explain administrative action as to frustrate effective judicial review, the remedy was not to hold a *de novo* hearing but, as contemplated by *Overton Park*, to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary"); see also, e.g., *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988) (quoting *Camp*).   In such instances, "[t]he court's inquiry outside the record is limited to determining whether the agency has considered all relevant factors or has explained its course of conduct or grounds of decision."   *Id.* (citing *Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir. 1986)).

34.   By contrast, where it appears that the agency has relied on documents not included in the administrative record, "supplementation is appropriate." *Portland Audubon Society*, 984 F.2d at 1548.  In such instances, "the crux of the analysis is whether the documents or materials [that a party requests be added to the administrative record] were actually considered, directly or indirectly, by the agency decisionmakers." *Pacific Coast Federation of Fishermen's Association/ Institute for Fisheries Resources v. Gutierrez*, No. 1:06-CV-00245 OWW LJO, 2007 WL 1752287, *2 (E.D. Cal. June 15, 2007) (citing *Thompson*, 885 F.2d at 555).

35.   The FDIC's deposit insurance determinations are governed by regulations set forth in 12 C.F.R. § 330.  These regulations define "deposit account records" as including "account ledgers, signature cards, certificates of deposit, passbooks, corporate resolutions authorizing accounts in the possession of the insured depository institution and other books and records of the insured depository institution, including records maintained by computer, which relate to the insured depository institution's deposit taking function." 12 C.F.R. § 330.1(e).[36]  Regulations providing for the recognition of deposit ownership and fiduciary relationships note that, except under circumstances not relevant here, when "determining the amount of insurance available to each depositor, the FDIC shall presume that deposited funds are actually owned in the manner indicated on the deposit account records of the insured depository institution." 12 C.F.R. § 330.5(a)(1).[37]  Significantly,

_____

[36]The term excludes "account statements, deposit slips, items deposited or cancelled checks."  12 C.F.R. § 330.1(e).

[37]The provision further states:
"If the FDIC, in its sole discretion, determines that the deposit account records of the insured depository institution are clear and unambiguous, those records shall be considered binding on the depositor, and the FDIC shall consider no other records on the manner in which the funds are owned.  If the deposit account records are ambiguous or unclear on the manner in which the funds are owned, then the FDIC may, in its sole discretion, consider evidence other than the deposit account records of the insured depository institution for the purpose of establishing the manner in which the funds are owned.  Despite the general requirements of this paragraph

there is no mention of the RLS in the FDIC's governing regulations.

36.   The administrative record attached to the Koch declaration did not contain copies of relevant bank records that must necessarily be reviewed to evaluate whether the FDIC's determination was arbitrary and capricious or an abuse of discretion.  Indeed, the only attached record was the XX/PH Worksheet produced by the RLS.  This document was insufficient to establish ownership of the account.  The court thus could not definitively determine on which records or other information the FDIC relied in making the insurance determination.

37.   Indeed, after reviewing the XX/Ph Worksheet produced by the RLS, it appeared clear that the FDIC had relied indirectly on some other document or documents in compiling the information in the RLS. The parties stipulated that the court could consider certain additional documents, including: (1) the FDIC's responses to interrogatories;[38] (2) the FDIC's response to plaintiffs' request for production of documents;[39] (3) the RLS records for accounts XXXXXX665, XXXXXX0780, XXXXXX0779, XXXXXX5987, and XXXXXX3163;[40] (4) an FDIC callback form;[41] (5) a printout of a screenshot that is too blurry to discern its contents;[42] (6) an FDIC form titled a "declaration for testamentary deposit" signed by Elham Mehraban, which establishes that the XXXXXX6665 account

---

(a)(1), if the FDIC has reason to believe that the insured depository institution's deposit account records misrepresent the actual ownership of deposited funds and such misrepresentation would increase deposit insurance coverage, the FDIC may consider all available evidence and pay claims for insured deposits on the basis of the actual rather than the misrepresented ownership."  12 C.F.R. § 330.5(a)(1).

[38]Joint Stipulation and [Proposed] Order to Allow the Court to Consider Documents in Deciding the Issue Before It Under 5 U.S.C. § 706 ("Supp Docs."), Docket No. 31 (Jan. 22, 2010) at 1-15.

[39]Supp. Docs. at 16-27.

[40]Id. at 28-29.

[41]Id. at 30.

[42]Id. at 31.

was an informal revocable trust account;[43] (7) an internal FDIC email indicating that Elham Mehraban had called;[44] (8) an FDIC form titled "Account Hold Release;[45] (9) a certificate of deposit for account XXXXXX6665;[46] (10) signature cards for accounts XXXXXX5987, XXXXXX3163, XXXXXX6683, and XXXXXX6665;[47] (11)certain unidentified screenshots titled "Interaction History";[48] (12) account transaction histories for 2007 and 2008 for the XXXXXX6665 account;[49] (13) account statements for various accounts;[50] and (14) a letter from the FDIC to plaintiffs' counsel asserting that after a diligent search, no further documents could be found related to the Mehrabans' accounts.[51]  They did not stipulate, however, that these documents could be included in the administrative record.

38.  Although "supplementation [was] appropriate" because it appeared that the FDIC had relied on documents not included in the administrative record, *Portland Audubon Society*, 984 F.2d at 1548, this fact did not permit the court to consider documents in plaintiffs' possession that were not part of the administrative record.  See *Lands Council*, 395 F.3d at 1029 (noting that plaintiffs' "enthusiastic argument pressing evidence that the [agency may not have] consider[ed] stands at odds with the norms of administrative law and typical judicial review of agency action").  See also *Federal Power Commission v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976) ("[T]he focal point for

---

[43]*Id.* at 34-37.

[44]*Id.* at 38.

[45]*Id.* at 39.

[46]*Id.* at 46.

[47]*Id.* at 32-33, 47.

[48]*Id.* at 48-51.

[49]*Id.* at 52.

[50]*Id.* at 53-56.

[51]*Id.* at 57-58.

judicial review [must] be the administrative record already in existence, not some new record made initially in the reviewing court" (internal citation and quotation marks omitted)); *Southwest Center for Biological Diversity v. United States Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996) "Judicial review of an agency decision typically focuses on the administrative record in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court"); *Center for Biological Diversity v. U.S. Bureau of Land Management*, No. C-06-4884-SI, 2007 WL 3049869, *3 (N.D. Cal. Oct. 18, 2007) ("Judicial review of the agency action must be based on the whole administrative record, which includes everything that was before the agency pertaining to the merits of its decision").  As a consequence, on January 25, 2010, the court issued an order declining to consider the documents that were the subject of the parties' stipulation on the basis that they were extra-record evidence.

39.  "The [administrative] record[, however,] is not necessarily those documents that the agency has compiled and submitted as the administrative record; the court must look to all the evidence that was before the decision-making body."  *Public Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982) (internal citations and quotations marks omitted).  See also *Thompson*, 885 F.2d at 555-56 ("[t]he . . . administrative record . . . consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position" (emphasis original)).  Additionally, if, after considering the administrative record, the court finds that the agency's rationale is not sufficiently explained, it can "obtain from the agency . . . such additional explanation of the reasons for the agency decision as may prove necessary." *Camp*, 411 U.S. at 142-43.  See also *City and County of San Francisco v. United States*, 930 F.Supp. 1348, 1355-56 (N.D. Cal. 1996) ("When the administrative record so fails to explain agency action that judicial review of that action is effectively frustrated, the court may 'obtain from the agency, either through affidavits or testimony, such additional reasons for the agency decision as may prove necessary.' . . .  Similarly, the court may inquire outside of the administrative record 'when it appears the agency has relied on

documents or materials not included in the record,'" quoting *Camp*, 411 U.S. at 143).

40.   In this case, because it appeared that "the agency ha[d] relied on documents not in the record," the court on May 25, 2010 concluded *sua sponte* that supplementation of the record was needed "to determine whether the agency ha[d] considered all relevant factors and explained its decision."   Cf. *Home Box Office*, 567 F.2d at 52 (court *sua sponte* ordered the Federal Communications Commission to provide "a list of all of the *ex parte* presentations, together with the details of each, made to it, or any of its members or representatives, during the rulemaking proceedings").

41.   It directed the FDIC to produce: (1) evidence in the form of declarations or documents explaining how the information in the RLS concerning plaintiffs' accounts was populated; (2) any documents that would augment the record in that they were documents upon which the FDIC indirectly relied because they constituted the source information for the data input into the RLS; and (3) evidence in the form of declarations or otherwise explaining any technical terms or abbreviations included in the RLS or the documents produced pursuant to this order.   The court noted that the supplementation it sought should be comprised of records of the type enumerated in 12 C.F.R. § 330.1(e) and upon which the FDIC relied in reaching its final deposit insurance determination, as well as any other information which the FDIC, in its discretion, had gathered and considered concerning plaintiffs' accounts prior to the date the insurance determination was made (e.g., communications between the FDIC and plaintiffs or between the FDIC and IndyMac employees).   Cf. 12 C.F.R. § 330.5(a)(1).   In particular, the court sought evidence as to whether the RLS, upon which the FDIC's insurance determination was based, and which itself is not an IndyMac deposit account record, relied on and/or summarized documents not included in the administrative record filed with the court.

42.   In response to the court's order requiring supplementation of the administrative record, the FDIC filed the Villareal declaration, which the court deems to be in compliance with the supplementation order in that it: (1) explains the methodology by which the RLS database was populated from deposit account records maintained by IndyMac Bank; (2) attaches

1    IndyMac Bank deposit account records reflecting the deposit balance and nature of the
2    Mehrabans' accounts at IndyMac Bank; and (3) explains all technical terms and
3    abbreviations used both in the RLS and the IndyMac Bank source information.  It is clear
4    from the Villareal declaration that this source information is data upon which the FDIC
5    indirectly relied in reaching its insurance determination.

6    **C.    Whether the FDIC Properly Determined the Ownership of the Accounts  and**
7    **       the Amount of Deposit Insurance**

8    43.   The FDIC's deposit insurance determinations are governed by the regulations set forth in
9          12 C.F.R. Part 330.  As noted earlier, regulations concerning the recognition of deposit
10         ownership and fiduciary relationships note that, except in circumstances not relevant here,
11         when "determining the amount of insurance available to each depositor, the FDIC shall
12         presume that deposited funds are actually owned in the manner indicated on the deposit
13         account records of the insured depository institution."  12 C.F.R. § 330.5(a)(1).  See also
14         *Villafane-Neriz v. F.D.I.C.*, 75 F.3d 727, 731 (1st Cir. 1996) (holding that the FDIC "is
15         entitled to rely exclusively on the account records of the failed institution," and that "while
16         ownership under state law is one prerequisite for insurance coverage, the deposit account
17         records are controlling").  "Deposit account records" include "account ledgers, signature
18         cards, certificates of deposit, passbooks, corporate resolutions authorizing accounts in the
19         possession of the insured depository institution and other books and records of the insured
20         depository institution, including records maintained by computer, which relate to the
21         insured depository institution's deposit taking function."  12 C.F.R. § 330.1(e).  Under
22         this definition, IndyMac Bank's computerized data was a deposit account record on which
23         the FDIC was entitled to rely.

24   44.   At the time IndyMac closed, revocable trust accounts were insured up to $100,000 per
25         owner if certain conditions were met.  First, the title of the account had to reflect that the
26         funds were held pursuant to a formal revocable trust created by an owner or grantor.  The
27         owner or grantor was required to retain ownership of the account during his or her life.
28         12 C.F.R. § 330.10(f)(1), (4) (2008), 69 Fed. Reg. 2829-30 (Jan. 21, 2004) (stating that

"revocable trust accounts held in connection with a formal revocable trust created by an owner/grantor and over which the owner/grantor retains ownership during his or her lifetime," qualify for coverage if "the title of the account . . . reflect[s] that the funds in the account are held pursuant to a formal revocable trust"). Second, while the beneficiaries need not be identified by name in the deposit account records, they must be "qualifying" beneficiaries. The "owner's spouse, child/children, grandchild/ grandchildren, parent/parents, brother/brothers or sister/sisters" are "qualifying beneficiaries." 12 C.F.R. § 330.10(a) (2008), 64 Fed. Reg. 15657 (Apr. 1, 1999).[52]

45.    While the trust owner is the insured party, insurance coverage is provided for the interest of each qualifying beneficiary up to $100,000. 12 C.F.R. § 330.10(a) (2008), 64 Fed. Reg. 15657 (Apr. 1, 1999); 12 C.F.R. § 330.10(f)(1) (2008), 69 Fed. Reg. 2829 (Jan. 21, 2004).

46.    Stated differently, the FDIC insured each grantor up to $100,000 for the interest of each qualifying beneficiary. If each grantor held an amount for the benefit of the same qualifying beneficiary, those amounts were separately insured. 12 C.F.R. § 330.10(d) (2008), 63 Fed. Reg. 25760-61 (May 11, 1998); Advisory Opinion FDIC-05-05, Question Regarding Deposit Insurance for a "Spousal Revocable Living Trust," 2005 WL 2979649, *1-2 (Sept. 12, 2005) ("Under this rule, the FDIC would assume . . . that the two grantors . . . have contributed equal amounts. . . . The amount contributed by each grantor for each 'qualifying beneficiary' would be insured separately").

47.    In this case, there is one grantor and four beneficiaries. Koch determined that there were four beneficial relationships, each of which was a qualifying familial relationship. He therefore concluded that the accounts were entitled to insurance in the amount of

---

[52]Under the regulations in effect when IndyMac closed and the FDIC made the initial insurance determination challenged in this action, there was "no requirement . . . that the deposit account[ ] records of the depository institution indicate the names of the beneficiaries of the living trust and their ownership interests in the trust." 12 C.F.R. 330.10(f)(1), (4) (2008) 69 Fed. Reg. 2830 (Jan. 21, 2004).

$400,000.00.[53]   Because accounts XXXXXX5987 and XXXXXX3163 were held by Mehraban in trust for the same beneficiary, Elham Mehraban, there was a maximum of $100,000 in insurance for both accounts.  Because account XXXXXX6665 was held in trust for three beneficiaries, Danielle, Arielle, and Alan Mehraban, there was $300,000 in insurance available for that account.  Koch properly applied the amount of insurance available in each account to the outstanding balance, and concluded that there were $471,345.39 in uninsured deposits in accounts XXXXXX5987 and XXXXXX3163 and uninsured deposits of in account XXXXXX6665 in $78,670.43.

48.   The FDIC's final deposit determination regarding plaintiffs' accounts was in accordance with the law and supported by the type of evidence upon which FDIC was required to rely.

**D.   Whether the FDIC Properly Determined Plaintiffs' Entitlement to Additional Deposit Insurance Following Passage of the Dodd-Frank Act**

49.   "Section 335 of the [Dodd-Frank Act] retroactively increases the standard maximum deposit insurance amount from $100,000 to $250,000 for depositors in any institution for which, as here, the FDIC was appointed as receiver between January 1, 2008, and October 3, 2008." *Sunflower Bank, N.A. v. F.D.I.C.*, No. 09-4006-SAC, 2010 WL 3913597, *2 n. 4 (D. Kan. Sept. 30, 2010) (citing Pub.L. No. 111-203).

50.   Section 335 of the act requires that "any payment on a deposit claim made by the [FDIC] as receiver . . . to a depositor above the standard maximum deposit insurance amount in effect at the time of the appointment of the [FDIC] as receiver . . . shall be deemed to be

[53]Koch Decl., ¶ 6.  Plaintiffs offer no argument rebutting this determination; they simply state that the Koch declaration provides insufficient support for the determination, and that, as a result, the court should conclude that it was arbitrary and capricious or require the FDIC to produce further evidence. (Pls.' Brief at 2, 4-5).  The declaration of Victor Villarreal, however, appropriately supplements the administrative record with records that demonstrate the accuracy of the FDIC's determination.  Further, although the court did not consider them in reviewing the FDIC's decision, it notes that the signature cards plaintiffs proffered as an attachment to the Joint Stipulation and [Proposed] Order to Allow the Court to Consider Documents in Deciding the Issue Before It Under 5 U.S.C. § 706 confirm that accounts XXXXXX5987, XXXXXX3163, and XXXXXX665 were informal revokable trust accounts.

part of the net amount due to the depositor under" 12 U.S.C. § 1821(a)(l)(B).  Pub. L. No. 111-203, § 335,124 Stat. 1376 (July 21, 2010) (amending 12 U.S.C. § 1821(a)(l)(E)).

51.  Following passage of the Dodd-Frank Act, on September 23, 2010, the court ordered the FDIC to file a supplemental administrative record regarding the new deposit insurance determination.  In response, the FDIC filed the Davis declaration, which explains the methodology by which the FDIC arrived at its revised deposit insurance determination, and attaches IndyMac Bank deposit account records reflecting the deposit balance and nature of the Mehrabans' accounts at IndyMac Bank.  The exhibits to the declaration are clearly the source information upon which the FDIC relied in reaching its insurance determination. See *Thompson*, 885 F.2d at 555 ("[t]he 'whole' administrative record [ ] consists of all documents and materials directly *or indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position" (internal quotation marks and citation omitted)).  See also *City and County of San Francisco*, 930 F.Supp. at 1355-56 ("When the administrative record so fails to explain agency action that judicial review of that action is effectively frustrated, the court may 'obtain from the agency, either through affidavits or testimony, such additional reasons for the agency decision as may prove necessary.' . . . Similarly, the court may inquire outside of the administrative record 'when it appears the agency has relied on documents or materials not included in the record,'" quoting *Camp*, 411 U.S. at 143)).

52.  The original administrative record shows that account No. XXXXXX6665 had a balance of $378,670.43.[54]  Documents in the supplemental administrative record show that Mehraban received $300,000 in deposit insurance for this account under the deposit insurance regulations in effect on July 11, 2008.[55]  He also received a Receivership Certificate for $78,670.43 and a 50% advance dividend of $39,335.22.[56]  Following

---

[54]Davis Decl., ¶ 7, Ex. C (see column entitled "Original Balance").

[55]*Id*., ¶ 7.

[56]*Id*., ¶ 7, Ex. C (see columns entitled "RC Amount" and "DPS RC Dividends Paid").

passage of the Dodd-Frank Act, Mehraban became eligible for deposit insurance up to $750,000, or three times the new SMDIA.[57]   To satisfy the Dodd-Frank Act, the FDIC subtracted the amounts Mehraban had previously received – deposit insurance of $300,000 and an advance dividend of $39,335.22 from the maximum retroactive deposit insurance limit of $750,000.[58]   The total amount that Mehraban previously received, namely $339,335.22, was less than the maximum amount of the retroactive deposit insurance limit, $750,000.  He was thus entitled to receive the remaining 50% of the uninsured deposit balance on Account No. XXXXXX6665, or $39,335.21, because this was less than the amount of the remaining retroactive insurance.[59]

53.   The original administrative record reflects that Accounts Nos. XXXXX5987 and XXXXXX3163 had a combined account balance of $571,944.46.[60]   Mehraban received $100,000 in deposit insurance for these accounts under the deposit insurance regulations in effect on July 11, 2008, a Receivership Certificate for $471,944.46, and a 50% advance dividend of $235,972.24.[61]   Under the Dodd-Frank Act, Mehraban became eligible to receive deposit insurance of $250,000 on these accounts under the new SMDIA.[62]   To satisfy the Dodd-Frank Act, the FDIC subtracted the $100,000 Mehraban previously received as deposit insurance and the advance dividend of $235,972.22 from the maximum amount of retroactive deposit insurance available of $250,000.[63]   The total amount Mehraban previously received, $335,972.22, exceeded the retroactive deposit insurance

---

[57]*Id.*, ¶ 8.

[58]*Id.*, ¶ 9.

[59]*Id.*

[60]*Id.*, ¶ 10, Ex. C (see column entitled "Original Balance").

[61]*Id.*, ¶ 10, Ex. C (see column entitled "RC Amount" and "DPS RC Dividends Paid").

[62]*Id.*, ¶ 11.

[63]*Id.*, ¶ 12.

ceiling; consequently, Mehraban did not receive a disbursement for Accounts Nos. XXXXXX5987 and XXXXXX3163.[64]  Because Mehraban received an additional $150,000 in deposit insurance – $250,000 under the new SMDIA minus $100,000 under the old SMDIA, the FDIC sent Mehraban a revised Receivership Certificate for $321,944.46 dated July 30, 2010.[65]

54.   The FDIC's final deposit insurance determination regarding plaintiffs' accounts was thus in accordance with the law and supported by the type of evidence on which the FDIC must rely. See 5 U.S.C. § 706(2)(A); *O'Keeffe's, Inc.*, 92 F.3d at 942.  See also *Elizabeth v. Federal Deposit Ins. Corp.*, No. CV 08-6028 PA (JWJx), 2010 WL 1266826, *6 (C.D. Cal. Mar. 28, 2010) ("The FDIC's determination that Plaintiff held a total of $113,105.15 in revocable trust accounts with Mr. Oswalt as a beneficiary, which was $13,105.15 over the deposit insurance limit, was not arbitrary or capricious or otherwise not in accordance with the law, and was a determination made within the FDIC's sole discretion.  The FDIC's determination that $13,105.15 of the deposit balances in Plaintiff's Account Nos. 9098, 9100, 9119, and 9128 was considered uninsured is therefore in accordance with law

---

[64]*Id.*

[65]*Id.*, Exh. D.  Plaintiffs dispute the FDIC's application of the Dodd-Frank Act, asserting that they should receive a new disbursement of $75,000 for every $250,000 in retroactive deposit insurance.  (Plaintiffs' Supp. Brief at 2-3; Plaintiffs' Supp. Reply at 4.)  They suggest that the FDIC's interpretation penalizes those investors with account balances greater than $250,000, and is therefore an arbitrary interpretation of the Dodd-Frank Act.  (Plaintiffs' Supp. Reply at 4-5.)  Plaintiffs' argument ignores the clear language of the act, which requires that, in applying the $250,000 deposit insurance amount retroactively to January 1, 2008, the FDIC subtract: (1) deposit insurance previously paid to the depositor by the FDIC, and (2) amounts such as dividends previously paid to depositors by the FDIC Receiver.  See Pub. L. No. 111-203, § 335, 124 Stat. 1376 (July 21, 2010) (amending 12 U.S.C. § 1821(a)(1)(E)).  Because depositors whose account balances exceeded $250,000 received a dividend equivalent to 50% of their uninsured deposits, subtracting the value of the dividend from the new maximum amount of deposit insurance now available may well yield an entitlement to a small amount of deposit insurance or possibly no additional insurance.  This is because such depositors have already received a dividend equivalent to all or the majority of additional insurance available after Dodd-Frank.  Such a result is mandated by the plain language of the act, and the FDIC's calculation is therefore not arbitrary and capricious.

and supported by the evidence upon which the FDIC is entitled to rely," citing 5 U.S.C. § 706(2)(A); *O'Keeffe's, Inc.*, 92 F.3d at 942.

### III. CONCLUSION

For the reasons stated, the court finds that plaintiffs are not entitled to recover further insurance for their revocable trust accounts from the FDIC.

DATED: August 30, 2011

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE